IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

**Alexandria Division**

| | |
|---|---|
| ROQUE "ROCKY" DE LA FUENTE, *Plaintiff*, v. JAMES B. ALCORN *et al.*, *Defendants*. | Civil No. 1:16-cv-1201 Hon. Liam O'Grady |

## ORDER

Plaintiff Roque ("Rocky") De La Fuente is an independent candidate for President of the United States in 2016. He is on the ballot for the upcoming general election in more than 16 states around the nation, but the Virginia Board of Elections ("Board") has determined that he did not satisfy the necessary requirements to appear on the ballot in Virginia. As a result, Plaintiff filed this Motion for Emergency Preliminary Injunctive Relief, seeking to prevent Virginia from distributing ballots without his name on them. Though plaintiff raises some interesting questions of law, his complaint does not meet the high standard for a preliminary injunction, and his motion must therefore be DENIED.

### I. BACKGROUND

After failing to obtain the Democratic Party nomination, Plaintiff decided to run for president as an independent candidate in the 2016 election. As a prerequisite to appearing on the ballot, the Commonwealth of Virginia requires independent candidates to submit 5,000 valid signatures of registered Virginia Voters to the Virginia Department of Elections ("the Department") 76 days before the election. This year, that date was August 26, 2016.

1

There are a few additional regulations governing who gets on the ballot. First, the 5,000 signatures must appear on official petitions. These petitions have an optional column in which voters can place their social security number ("SSN") to help the Board verify their identity. In addition, the forms must contain the names of eleven presidential electors, one from each congressional district in the Commonwealth (and two at large candidates). These individuals can only become presidential electors by submitting their SSNs and other personal information to the Board. Finally, prospective presidential candidates may not begin collecting signatures until they have obtained verification for all 11 sponsoring presidential electors. Plaintiff alleges that requiring SSNs for electors made it harder to find electors and took away from the time he could have been collecting petition signatures. Similarly, he alleges that some would-be voters refused to sign his petition because they did not want to provide their SSNs.

According to the complaint, Plaintiff's agents filed 1,122 petition pages containing 6,990 signatures before the deadline of August 26, 2016. On August 31, 2016, however, the Department sent Plaintiff a "Notice of Deficiency stating that, of the 6,990 signatures that Mr. De La Fuente had filed, only 1,437 had been verified by the Department. On September 7, 2016, the Department filed an amended Notice of Deficiency, alleging that Plaintiff had only submitted 4,433 signatures, and that only 2,557 of those had been valid. Plaintiff asserts that the Department either "destroyed, lost, or otherwise negligently handled plaintiff's petition pages containing at least 2,557 signatures."

On September 9, Plaintiff filed a timely appeal within the timeframe set forth under Va. Code §§ 24.2-506 and 24.2-543. On September 12, Plaintiff notified the Board of the factual and legal arguments in support of his appeal. These included challenges as to: (1) 2,557 lost or un-reviewed signatures; (2) 811 signatures that could not be identified; and (3) 152 signatures

classified as "illegible." Shortly thereafter, Defendants summarily rejected plaintiff's appeal and Plaintiff's hearing on September 14 never took place. In complying with the timeline for the appellate process, Plaintiff asserts that he only had one day to review, record and establish evidence of thousands of signatures in preparation for his appeal.

After the Board denied his appeal, Plaintiff filed suit in this Court on September 21, 2016. He asks for emergency mandamus relief to get his name on the ballot. In addition, he requests permanent injunctive relief relating to the provisions of Virginia law that govern the collection of social security numbers. He also levies facial challenges against §§ 24.2-506 and 24.2-543 of the Code of Virginia.

Because of the emergency nature of Plaintiff's motion, the Court held a hearing on Friday, September 23, 2016. At the hearing, the Court heard arguments from both parties and received testimony from Edgardo Cortés, the Commissioner of Elections for the Commonwealth of Virginia. During the hearing, the Court granted Plaintiff's oral motion to file post-hearing briefing on the question of whether Defendants' use of SSNs is permissible under federal law.

## II. DISCUSSION

The standard for a preliminary injunction is a difficult one. The plaintiff must show that: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities "tips in his favor"; and (4) the preliminary injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The movant bears the burden of proof on all four independent factors, and the court must consider each factor in reaching its decision. *Id.*

A.   **Likelihood of Success**

Plaintiff raises novel constitutional and statutory challenges to Virginia's system of qualifying candidates for the ballot. These challenges essentially boil down into three arguments: (1) that Defendants' collection of social security numbers is preempted by federal law; (2) that using social security numbers on the forms for electors (required) and petitions (optional) impermissibly burdens voters' freedom of expression under the First Amendment; and (3) that the administrative system for counting and challenging petition signatures under §§ 24.2-506 and 24.2-543 of the Code of Virginia violates the procedural due process guarantees of the Fourteenth Amendment. Although each of these arguments provides a distinct possibility of success on the merits, the Court cannot say that success is "likely" without the development of additional facts.

Plaintiff is confronted with one key barrier to success: he cannot show that, absent Defendants' conduct or the allegedly unconstitutional laws, he would have obtained the necessary 5,000 signatures.[1] In this regard, Mr. Cortés's testimony was insightful. Mr. Cortés explained that, when Plaintiff received the August 31 email stating that he had 6,990 signatures, that figure represented the total *possible* signatures that Plaintiff could have obtained based on the number of petition pages reviewed at that time. In other words, 6,990 was not the number of signatures reviewed, but rather the number of signature *lines* reviewed. Defendants' additional exhibits suggest that the Board eventually reviewed about 12,329 total signature lines, but that it

---

[1] The Supreme Court has established that, in order to prevent voter confusion, states are permitted to require a threshold showing of support before an individual is entitled to appear on the ballot. *See* Munro v. Socialist Workers Party, 479 U.S. 553 (1986) (upholding a requirement that candidates receive 1% of all votes cast for a particular office at the primary election); *see also Lubin v. Panish*, 415 U.S. 709, 718-19 (1974) (recognizing that candidates "may be required to demonstrate the 'seriousness' of their candidacy by persuading a substantial number of voters to sign a petition in [sic] his behalf").

4

only received 4,433 total signatures, making it impossible for Plaintiff to reach the 5,000 needed to be on the ballot, even if all the signatures had been valid.

Without discovery, the Court does not make any factual findings regarding the truth of Defendants' assertions. Plaintiff still alleges that more than 2,000 signatures were missing or lost in the Board's custody, and it is not clear that Defendants provided an effective response to this claim in the appellate process. Indeed, Defendants admit that some of the petitions from the wrong party were mixed in with Mr. De La Fuente's petitions, and the Board cannot certify that none of Mr. De La Fuente's petitions were lost. *See* Cortés Decl., Dkt. No. 8-1 at 3 ¶¶ 11-14. Furthermore, it does not strain credulity to believe Plaintiff's contention that requiring SSNs from electors and including a SSN column on petitions deterred individuals from putting their information on the necessary forms. At this time, however, the evidence produced by Defendants creates a plausible alternative explanation that renders the Court unable to find that Plaintiff has proven his burden on the likelihood of success.

### B. Plaintiff's Irreparable Harm

Plaintiff will undoubtedly suffer some harm from the denial of this motion if the Virginia laws are ultimately invalidated. *Elron v. Burns*, 427 U.S. 347, 353 (1976) ("The loss of First Amendment rights, for even minimal periods of time, unquestionably constitutes irreparable injury."). His exclusion from the ballot will likely diminish the votes he gets and may hamper his ability to use this election to advance his political career. In isolation, therefore, Plaintiff's alleged harm would likely provide a basis for granting his motion.

### C. Balance of Equities

The harm that Defendants would suffer if the Court granted the motion would be great. Under the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), absentee

ballots must be mailed no later than 45 days prior to an election. *See* 52 U.S.C. § 20302(a). This year, that deadline fell on September 24, 2016. Because September 24 was a Saturday, most of the ballots were sent out Friday, September 23, the day the Court heard arguments on this motion. Indeed, most of the ballots had likely been mailed a week before, or at least by the time the hearing for this matter was finished on Friday evening.

In light of this federal requirement, any injunctive relief issued by the Court would require Virginia localities to violate federal law. As a practical matter, it would also force them to make new ballots, resend those ballots to absentee voters, and establish a system for ensuring that the old ballots were destroyed and not counted in the election. This would require a great deal of time, energy, and taxpayer dollars, and it qualifies as a significant burden.

Moreover, by Plaintiff's own admission, the likelihood of him winning the election is slim to none. At oral argument, he conceded that he did not anticipate receiving more than five percent of the vote. This is not to take away from the inherent value in Plaintiff's (and his supporters') political expression, but it does serve to mitigate the actual harm that Plaintiff will suffer. As such, because of the timing of this case and the deadline imposed by the UOCAVA, the balance of the equities tips slightly in Defendants' favor. *See League of Women Voters of N. Carolina v. N. Carolina*, 769 F.3d 224, 229 (4th Cir. 2014), *cert. denied*, 135 S. Ct. 1735 (2015) (acknowledging that "a tight timeframe before an election" does not diminish the fundamental right to vote, but highlighting the hardship that an injunction would cause for the state).

### D. The Public Interest

"[A]pplications for a preliminary injunction affecting ballot access have been 'consistently denied when they threaten to disrupt an orderly election.'" *Parson v. Alcorn*, 157 F. Supp. 3d 479, 500 (E.D. Va. 2016) (citing *Perry v. Judd*, 471 F. App'x 219, 227 (4th Cir.

6

2012)). Indeed, where a preliminary injunction may have negative effects on the general election, the Fourth Circuit has stated: "These [negative effects] are not just caution lights to lower federal courts; they are sirens." *Perry v. Judd*, 471 F. App'x 219, 227 (4th Cir. 2012).

At this juncture, with ballots out to overseas voters and with the general election looming in just over a month, the risk of disrupting an orderly election is significant. As discussed above, if the Court granted Plaintiff's motion, Virginia would need to develop a detailed remedial plan in order to ensure that the correct ballots were cast and the improper ballots were appropriately destroyed. The risk of votes being miscounted because the old ballots were used is particularly high. This is especially true given the fact that individual localities will often administer the election. *See* 52 U.S.C. § 20302(c). The diffusion of responsibility to local governments makes coordination both a practical and a legal burden, and it creates an increased risk of a disrupting the election.

On the other hand, there is a significant public interest in allowing the voting population to have the candidate of their choosing on the ballot. *Perry v. Judd*, 840 F. Supp. 2d 945, 960 (E.D.V.A. 2012), *aff'd* 471 F. App'x 219 (4th Cir. 2012) (holding that, but for the doctrine of laches, Plaintiffs would be entitled to an injunction). Mr. De La Fuente may not have a strong chance of winning the election, but his values and his platform may resonate with some voters, and those voters should have their support recognized in the form of a ballot option.

Indeed, democracy is diluted when the public's choice of candidates is limited. Although the two-party system dominates our country's political landscape, the diffusion of ideas through third-party and independent candidates has a meaningful influence on the political dialogue. This ideological check is important because it reminds the dominant parties that their position of strength is wholly dependent on the will of the people. Should they fail to maintain that support,

it is critical that individual voters have someone else to whom they can turn. Without that check, the dominant parties will maintain that dominance without regard to their merit and without an ear to the needs of their constituents.

Given the Fourth Circuit's cautionary language in similar cases, the Court is reluctant to find that the public interest favors the Plaintiff. If this case had commenced on an earlier date and the requested remedy did not require Virginia to resend thousands of ballots, this factor would have likely tipped in Plaintiff's favor. As it stands, however, the public interest demands an orderly election and Plaintiff's motion for a preliminary injunction must be denied.

### III. CONCLUSION

At first blush, Defendants' expansive use of social security numbers in the ballot qualification process gives cause for concern, and the Court looks forward to examining the issues going forward. However, on the undeveloped factual record before the Court, Plaintiff does not meet the high preliminary injunction standard that the law requires.

Therefore, for the reasons stated above, it is hereby **ORDERED** that:

1. Plaintiff's Motion for Emergency Preliminary Injunctive Relief is **DENIED**.

2. In response to Plaintiff's oral motion to amend his complaint to include a claim for damages, Plaintiff shall have 30 days to file an amended complaint if he so chooses.

3. Any further submissions from Plaintiff must comply with the requirements set forth in the Local Rules, including requirements for pro hac vice admissions.

September 30, 2016
Alexandria, Virginia

/s/
Liam O'Grady
United States District Judge

8